UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

CASE NO.: 9:26-cv-80973-EA

LILLIAN HASSANEIN,

Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY
BOARD OF TRUSTEES,

Defendant.

______________________________________

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1. Plaintiff LILLIAN HASSANEIN, by and through her attorneys, Stewart Lee Karlin Law Group, P.C., brings this civil action against Defendant THE FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES, the public body corporate that governs Florida Atlantic University and the Charles E. Schmidt College of Medicine, for disability discrimination, failure to accommodate, retaliation, breach of contract and other violations arising during Plaintiff's medical education at Florida Atlantic University.

2. Beginning no later than 2024 and continuing through Plaintiff's dismissal in 2026, Defendant denied disability-related medical leave and withdrawal requests, failed to engage in an individualized accommodation process, obtained or retained disputed evaluations and professionalism materials after receiving protected reports, and relied on the resulting record in academic and dismissal proceedings. Earlier events are alleged only as background and notice unless expressly identified as a timely, independently actionable act.

## PARTIES

3. Plaintiff LILLIAN HASSANEIN (hereinafter "Plaintiff") is an individual and former medical student who attended the Florida Atlantic University Charles E. Schmidt College of Medicine during the relevant period until Defendant dismissed her from the program. Plaintiff has disability under the ADA and 504. Plaintiff has a diagnosed mental impairment, including post-traumatic stress disorder which directly impacted major life activities to wit: the ability to concentrate, learn, sleep, prepare for and complete examinations, and participate in clinical rotations.

4. Defendant THE FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES is the public body corporate responsible for governing Florida Atlantic University and the Charles E. Schmidt College of Medicine. Defendant may sue and be sued under section 1001.72, Florida Statutes, and is referred to in this Complaint as "Defendant" or "the University."

5. At all relevant times, Defendant acted under color of state law and was a state actor for purposes of any properly pleaded claim arising under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6. At all relevant times, Defendant received federal financial assistance and operated education programs and activities within the meaning of Title IX of the Education Amendments of 1972 and Section 504 of the Rehabilitation Act.

7. At all relevant times, Defendant was a public entity within the meaning of Title II of the Americans with Disabilities Act.

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including Title IX, 20 U.S.C. § 1681 et seq.; Section 504

of the Rehabilitation Act, 29 U.S.C. § 794; the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. and 42 U.S.C. § 12203; and the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983. This Court also has civil rights jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) for Plaintiff's claims seeking redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

9. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state law breach of contract claim as it arises from the same case or controversy as the federal claims.

10. Venue is proper under 28 U.S.C. § 1391 because Defendant resides in this District for a substantial part of the events or omissions giving rise to the claims, which occurred within Palm Beach County, Florida.

**FACTUAL STATEMENT**

11. Plaintiff enrolled in Defendant's Charles E. Schmidt College of Medicine in August of 2020.

12. As a medical student, Plaintiff was entitled to participate in Defendants' academic, clinical, student affairs, disciplinary, mistreatment reporting, disability accommodation, and Title IX processes free from discrimination, retaliation, hostile conditions, and arbitrary or disparate treatment.

13. Plaintiff has a diagnosed mental impairment, including post-traumatic stress disorder. During the relevant 2024 to 2026 period, symptom exacerbations substantially limited her ability to concentrate, learn, sleep, prepare for and complete examinations, and participate in clinical rotations. Plaintiff became unable to maintain concentration for examination preparation, cried and had to leave a psychiatry shelf examination, appeared visibly distraught and unable to perform to

multiple faculty members, and was ultimately removed from rotations by the Physicians Resource Network because of severe symptoms.

14. Plaintiff sought assistance from Defendants' student-affairs, civil rights, victim advocacy, faculty, and accessibility processes and requested reasonable accommodations and supportive measures, including separation from students involved in harassment or assault, protection from hostile encounters, confidentiality, and academic consideration for disability and trauma related impacts.

15. Plaintiff does not seek independent relief for any discrete act occurring before August 12, 2022. Allegations predating that date are pleaded only as background, notice, context, and evidence bearing on Defendant's knowledge, intent, asserted nondiscriminatory explanations, and the meaning of distinct acts occurring within the limitations period. Plaintiff's claims for relief are based on the separately alleged acts occurring on or after August 12, 2022, including the 2024 accommodation decisions, evaluations, professionalism proceedings, 2025 appeals and protected activity, retention and use of disputed records, and the 2026 dismissal process.

**A. 2020-2021: Reports of Harassment, Stalking, and Sexual Assault**

16. During Plaintiff's first year, she reported misconduct that was in violation of school policies, including discriminatory remarks, harassment, threats, cheating, and mistreatment involving students and faculty. Specifically, a student group chat on or about July 2020, in which several individuals disclosed personal information, revealing mental health issues, drug abuse, and sexual abuse.

17. On or about November 19, 2020, Plaintiff discussed with Dr. Caceres concerning content in a student group chat, including evidence of racism and harassment toward peers and faculty.

18. On or about December 1, 2020, several students in the medical program contacted Plaintiff

to question her decision to report Sim Hamid for using a racial slur.

19. On or about December 9, 2020, the Office of Student Affairs Deans requested a meeting with Plaintiff without specifying its purpose.

20. On or about December 10, 2020, Plaintiff met with OSA Deans and was told that she had been accused of bullying by Simran Hamid, who had used a racial slur toward an African American classmate. Hamid claimed that Plaintiff's involvement in reporting her for the racial slur constituted bullying.

21. On or about December 17, 2020, Plaintiff met with OSA Deans and Simran Hamid. During that meeting, OSA Deans characterized the matter as disruptive and stated that future conflicts should be handled without involving OSA. During the same meeting, Simran Hamid revealed that group-chat members, except Plaintiff and Madeline Forouhi, had signed a petition contending that the racial slur was taken out of context.

22. On or about December 19 and December 21, 2020, Plaintiff sent additional photographs and information to OSA Deans concerning the behavior and comments of students in the group chat, but received no response.

23. On or about January 5, 2021, Plaintiff emailed Dr. Markowitz, then Senior Dean of Student Affairs, requesting a meeting by Webex or telephone to discuss a leave of absence due to safety concerns, but received no response. She was reaching out to request a leave of absence, as she did not feel safe at school with the behavior she witnessed/was being subjected to.

24. On or about January 8, 2021, the Plaintiff notified fellow student Madeline Forouhi ("Forouhi") that she wished to discontinue further contact, subsequent to her rejection of Forouhi's aggressive sexual advances. Forouhi subjected Plaintiff to persistent stalking, obsessive communication, dissemination of rumors about the Plaintiff among classmates, concerted efforts

to isolate the Plaintiff from family and friends, and manipulative threats of self-harm.

25. On or about January 15, 2021, Dr. Caceres requested a meeting for January 20, 2021.

26. On or about January 19, 2021, Dr. Caceres stated that Dr. Markowitz would join the check-in meeting as a follow-up to the prior semester's meeting, but the meeting was then canceled by the deans and rescheduled for February 3, 2021.

27. Plaintiff began requesting that her classmates escort her to classes, citing concerns regarding her safety due to potential actions by Forouhi and her acquaintances.

28. On or about February 3, 2021, the Plaintiff convened with the OSA Deans. The Deans expressed an accusatory tone, asserting, "Just because you're messed up doesn't mean that you're not responsible for your actions," and further accused the Plaintiff of disrupting the class and damaging the environment at FAU's College of Medicine by allegedly "starting drama."

29. On or about February 11, 2021, Plaintiff contacted the Office of Equity and Inclusion regarding ongoing bullying by classmates. On or about February 12, 2021, Plaintiff also contacted FAU Victim Advocate Candace Harrinarine and reported that she felt unsafe and wanted to be placed in a different group than the student she identified as her abuser.

30. On or about February 15, 2021, Plaintiff met with OSA Deans and provided evidence of student harassment, including videos and pictures recorded by students during Zoom classes used to insult classmates. Plaintiff further expressed her concerns about being stalked by Forouhi because she had rejected her advances. Plaintiff followed up with an email that was never answered.

31. On or about February 18, 2021, Plaintiff spoke with Dr. Holley and Dr. Martinez about switching from in-person clinical skills to virtual sessions for two weeks because of harassment and safety concerns.

32. On or about March 3, 2021, Dr. Lisa Martinez emailed Plaintiff regarding Plaintiff appearing depressed at clinical skills and expressing concern. Plaintiff responded that she felt safe in that session because two members of the group chat, Madeline Forouhi and Aviv Elimelech, were not present.

33. On or about March 5, 2021, Plaintiff spoke with Dr. Caceres to discuss ongoing retaliatory harassment, discomfort in classroom settings, and the consequent impact on her academic performance in Neurology. Plaintiff expressed her reluctance to collaborate with students actively engaged in the harassment or stalking she experienced. Initially, Dr. Caceres indicated that it was not within the school's responsibilities to intervene in student affairs and recommended that Plaintiff disregard the harassment. After substantial resistance, Dr. Caceres advised Plaintiff to contact the Office of Equity and Inclusion to request separation.

34. On or about March 15, 2021, Plaintiff contacted the NSB professor to discuss her failing grade. The professor refused to meet, citing finalized grades, despite being aware of the harassment occurring during the course.

35. On or about March 17, 2021, Plaintiff contacted Dr. Caceres and stated that harassment affected her academics and that she wanted to repeat the course instead of remediation. Plaintiff stated the stalking and lack of support were severely impacting her health and education.

36. On or about March 22, 2021, Plaintiff emailed OEI requesting separation from members of the group chat due to ongoing harassment and attached evidence supporting her request.

37. On or around March 26, 2021, the Plaintiff met with Mr. Ryan Kelley at OEI and formally requested not to be assigned to work with Forouhi or the students engaged in harassment towards her. Mr. Kelley indicated that Dr. Caceres and Dr. Markowitz did not want disruptions, thereby perceiving Plaintiff's request for a safe environment free from stalking and harassment as a

disturbance. Plaintiff identified that this was a significant factor contributing to the development and exacerbation of her post-traumatic stress disorder, as her entitlement to a safe environment was persistently denied and ridiculed. Despite raising these safety concerns, the University took no action, and Plaintiff was forced to remain in classes with Forouhi.

38. On or about April 9, 2021, Plaintiff contacted Victim Advocate Candace Harrinarine to discuss filing a restraining order against Madeline Forouhi. Harrinarine directed Plaintiff to FAU PD to discuss further. FAU PD did not respond to Plaintiff's email for help filing a restraining order.

39. On or about April 15, 2021, Plaintiff contacted Dr. Lisa Martinez regarding being harassed and recorded in class by two classmates, but Plaintiff received no response.

40. In or about late April 2021, Plaintiff was contacted by Dr. Markowitz, who stated he received an email from a student expressing concern about her safety after hearing she had been sexually assaulted. Following this, Dr. Markowitz made several inappropriate and sexually charged remarks that caused Plaintiff significant distress.

41. On or about May 6, 2021, the Plaintiff contacted the OSA Deans to inquire whether her failing grade in Neurology could be omitted from her academic transcript owing to the ongoing adversity she faced. Plaintiff asserted that she was deprived of the same opportunity to focus on her studies as her peers, owing to being actively subjected to stalking, the lack of response to her multiple emails to the administration, and the obstruction of her Title IX rights.

42. On or about May 27, 2021, Plaintiff sent an email to Dr. Gundersen, informing her of her sexual assault, stalking, and threats. Plaintiff's email received no response.

43. In or around June 2021, a professor disclosed Plaintiff's failing score to another medical student through email, violating Plaintiff's educational privacy rights and further exposing her to

harassment and ridicule, as other students became aware of her academic probation.

44. Plaintiff's end-of-year grades included "Satisfactory with Concern" in Fundamentals of Basic Sciences, "Satisfactory" in Foundation of Medicine 1, "Unsatisfactory" in Neurology, and "Satisfactory with Concern" in Foundation of Medicine 2. The failing grade in Neurology was caused or exacerbated by Defendants' failure to protect her from harassment, stalking, and hostile educational conditions. The Defendants failed to even respond to her various emails for help. Instead of support, Plaintiff was met with perverse comments from Dr. Markowitz, who mocked her for her hardships and made several sexually charged and inappropriate comments that distressed Plaintiff. Due to inappropriate sexual comments by Dr. Markowitz, many emails seeking support went unanswered by the administration and FAU PD, and multiple of her Title IX rights were blocked, Plaintiff did not open an investigation against her stalker.

**B. 2021-2024: Withdrawal, Return, Renewed Harassment, and Professionalism Proceedings**

45. In approximately July 2021, the Plaintiff approached the Office of Equity and Inclusion to request an investigation into retaliation she had experienced and to seek a restraining order against her stalker. She was informed that all matters related to the July 2020 group chat had been addressed by the College of Medicine.

46. When Plaintiff questioned this, asserting that these issues were serious and violated the Student Code of Conduct, Title IX, and Title VI, she was again told that only Forouhi could be investigated. This caused Plaintiff considerable distress, as she believed that both issues were interconnected and that the University was not addressing her concerns with the appropriate seriousness.

47. In or around July 2021, Plaintiff resumed her second academic year with her original class and continued to endure harassment on campus from the same students she reported or who were

friends of her stalker. This harassment occurred in various locations on campus, including classrooms, restrooms, the lobby, and parking areas. She was subjected to derogatory comments such as “fucking bitch,” “cunt,” and “snitch” by the individuals who participated in the July 2020 group chat.

48. Plaintiff reported ongoing harassment to the Deans of Student Affairs, including Dr. Caceres and Dr. Gundersen, and indicated that a fellow student, Aviv Elimelech, physically pushed her in the lobby of the school. Additionally, she reported that two other students, Sohini Lahiri and Samantha Caballero, approached her friends and interrogated them about her.

49. On or about September 23, 2021, the Plaintiff decided to withdraw due to personal matters and safety concerns. This decision was necessary because she did not feel secure due to harassment and the University’s failure to provide effective protection and uphold the student code of conduct. Plaintiff believed it was safer to withdraw and forfeit the tuition fees than to risk remaining in an unsafe environment.

50. On multiple occasions, the Plaintiff inquired with Dr. Caceres regarding the possibility of obtaining a partial tuition refund due to the circumstances. Dr. Caceres consistently responded negatively. Additionally, Plaintiff expressed an intent to transfer to a different medical school, as she wished to disassociate herself from the University due to ongoing issues with the University’s professionalism and accountability, as well as her safety. Plaintiff repeatedly discussed with faculty and staff the necessity to go to a safe environment elsewhere.

51. In or around November 2021, Plaintiff filed a Physicianship Incident Report against Stuart Markowitz, then former Senior Dean of Student Affairs, based on inappropriate communications concerning Plaintiff’s reports of sexual assault and stalking and the lack of appropriate institutional response. Plaintiff stated to various faculty and employees, including Dr. Caceres, Dr. Gundersen,

Dr. Wood, and Dr. Ouslander how Markowitz denied her Title IX rights and how his perverse comments affected her when she sought help and action. Plaintiff also thoroughly discussed how his behavior negatively impacted her health and academics to the OCR9 office to Mr. Kelly and Mr. Diaz.

52. Plaintiff received assistance from senior classmates, who expressed their surprise that Dr. Caceres and Dr. Markowitz did not conduct further investigation or hold students accountable for widespread harassment. Additionally, they indicated that Dr. Markowitz often exhibited inappropriate behavior towards female students and made inappropriate remarks.

53. In or around November 2021, Plaintiff began requesting letters from faculty and staff acknowledging the bullying that occurred during her first year. She received supportive letters from Dr. Alison Holley, Dr. Lisa Martinez, and Victim Advocate Candace Harrinarine. Due to the OCR9 office stating everything had been handled despite ongoing abuse, Plaintiff even had a classmate submit documentation that Plaintiff was deteriorating from this abuse.

54. In or around December 2021, Plaintiff met with Dean Sarah Wood regarding the lack of appropriate action concerning harassment, stalking, and Title IX violations and the severe impact on her studies and health. Dean Wood characterized the events as personal and not the University's responsibility.

55. During her gap year, Plaintiff informed Dr. Caceres that rumors about her were circulating among her new classmates. Plaintiff requested intervention, stating that she did not want her education disrupted again by a hostile environment. Dr. Caceres stated that there was nothing she could do about the rumors and that she should move on.

56. Around July 2022, after rejoining a new class, several students, who were not known to Plaintiff, mentioned hearing various negative rumors about her from the previous class. These

included claims that she was a "snitch," gender-based insults, and advice that she should be avoided. One recurring "joke" she faced was that she was "double penetrated" by classmates. Plaintiff reported these incidents to Dr. Caceres and was advised to ignore them. Moreover, other students stated that faculty members had spoken poorly about her to students.

57. These rumors were enabled by Defendants' prior failure to protect her confidentiality, including the June 2021 disclosure of Plaintiff's grade to another medical student and the denial of Plaintiff's right to a Title IX investigation into retaliation.

58. The ongoing rumors about Plaintiff led to her feeling isolated and estranged from the school. Plaintiff frequently cited how when she was aggressively stalked, she was ridiculed and ignored instead of helped. Due to the inappropriate and discriminatory behavior, she experienced her first year, Plaintiff handled several dangerous situations by herself. One of these situations included inappropriate and invasive behavior by a classmate from the new class.

59. Plaintiff was frequently distressed by circulating rumors and the immediate proximity of her stalker, who was also enrolled in the new class. She consistently raised concerns with the faculty about the hostile environment and advocated for an investigation.

60. Due to the continued disruptions in her education, Plaintiff took another leave of absence before the April Step 1 deadline, as her education had been largely disrupted by stalking, harassment, and abuse.

61. Plaintiff attempted the Step 1 exam in August 2023 but did not pass. Plaintiff retook the exam in February 2024 with accommodations and passed.

62. Defendants' failure to address prior reports of harassment and stalking allowed a hostile environment to continue, exacerbating Plaintiff's PTSD symptoms, causing academic disruption, financial harm, and educational delay.

**C. 2024-2025: Clinical Rotation Disparate Treatment, Retaliation, and Related Proceedings**

63. In or around early April 2024, Plaintiff began her third-year clinical curriculum with a new class and initially received good evaluations from outpatient attendings.

64. Within the initial weeks of her return, Plaintiff manifested signs indicative of post-traumatic stress disorder, attributable to her exposure to the environment that caused her harm. Plaintiff was visibly distressed, and repeatedly expressed that the school was an unsafe environment. Plaintiff's condition was communicated to Dr. Caceres by multiple faculty members. Dr. Caceres was contacted that semester by Dr. Sutter, Dr. Zahra, Dr. Ferris, Ms. Guerra, and Ms. Santiago.

65. In or around June 2024, Plaintiff reported to the school that a classmate had informed her that Forouhi was still speaking cruelly about her, despite not having had contact in years. Defendants took no meaningful disciplinary action regarding this ongoing abuse.

66. At this time, Plaintiff was notified by a classmate that Forouhi had been placed on Plaintiff's psychiatry rotation despite her repeated requests not to be placed with Forouhi for safety reasons. Defendants initially declined to separate them, and Plaintiff had to repeatedly emphasize that it was a serious safety issue to be placed on rotation with the person who stalked and sexually assaulted her.

67. In or around early July 2024, Plaintiff began her psychiatry rotation. Residents reported hearing rumors about her from prior medical school classes, creating a negative first impression that other students did not face. Plaintiff was placed in an unfair position and believed she had no choice but to disclose her story to the attending out of concern.

68. Defendants violated Plaintiff's educational privacy rights by revealing or allowing disclosure of her grades or academic standing to other medical students, which made her a target

for harassment and stigma.

69. In or around July 2024, Plaintiff was notified of a Professionalism Violation and Title IX No Contact Order based on claims by fellow medical student, Ali Mohammed. Mohammed claimed that she was romantically interested in him and was spreading gossip about him. The accusations were false, and Defendants refused to provide Plaintiff with copies of any written accusations required to prepare for the related MSPPSC committee meeting.

70. Plaintiff requested an investigation into Mohammed's claims, clarifying that the claims were patently false. Regardless, Defendants rejected her request and proceeded with a professionalism violation against her on his behalf.

71. The treatment of Plaintiff's separation requests also departed from how Defendants handled comparable concerns raised by other students. When Mohammed made accusations against Plaintiff, Defendants provided him protective measures, including a chaperone and group separation. By contrast, Plaintiff's earlier and more serious requests for separation from a stalker and assailant were delayed, minimized, or characterized as disruptive. This disparate treatment supports an inference that the Defendants' stated professionalism rationale as a determining factor in her dismissal was not applied neutrally. In addition, Forouhi had received Alpha Omega Alpha, indicating that no disciplinary action was taken against her, despite Plaintiff going to extensive lengths to avoid Forouhi due to her aggressive stalking, contributing to the hostile environment.

72. On or about August 12, 2024, Dr. Caceres and Dr. Martinez required Plaintiff to meet regarding her psychiatry rotation. Plaintiff reported that a resident had forced her to write notes on patients she had not seen, called her disturbing names, and slammed a chair against a wall. Dr. Caceres and Dr. Martinez characterized this conduct as constructive feedback.

73. Plaintiff asked Defendant not to contact the psychiatry department before her evaluation

because she feared that doing so would prejudice the evaluation. Defendant nevertheless contacted the department and Plaintiff's attendings shortly before the evaluation.

74. On or about August 16, 2024, Plaintiff appeared before the promotions committee and was yelled at by Dr. Averkiou in front of the committee, in which he stated, "I'm just happy you didn't ruin Ali's life and future," based upon Ali Mohammed's false claims, revealing bias and causing severe humiliation and reputational harm. Plaintiff was simply presenting facts of inappropriate behavior from Mohammed towards her and was immediately lambasted.

75. On or about August 21, 2024, Plaintiff received a psychiatry evaluation from an attending she had not requested. The evaluation was submitted after the school contacted the attending about potential student mistreatment by their resident, shortly before Plaintiff's second promotion committee meeting. Plaintiff was given completely different feedback on the last day of the rotation. The evaluation was due to her complaints.

76. On or about August 26, 2024, a pediatrics attending pulled Plaintiff aside and stated that Plaintiff was visibly distraught, dysfunctional, and should take medical leave. Plaintiff agreed and stated that she would schedule a meeting with the Office of Student Affairs to request leave.

77. During this period, Plaintiff notified OCR9 that Mohammed was spreading extensive rumors about her despite a No Contact Order and that the continuing hostile environment had substantially disrupted her education.

78. On or about August 27, 2024, Plaintiff appeared before the promotions committee again and was referred to the Physicians Resource Network based on the professionalism violation arising from Ali Mohammed's false claims and the biased psychiatry evaluation issued after Defendants breached Plaintiff's confidentiality.

79. On or about September 16, 2024, Plaintiff received a letter from the school characterizing

a resident calling Plaintiff "stupid" and requiring her to write notes on patients she had not seen as constructive criticism. Plaintiff was forced to sign the letter under duress, despite it containing factually incorrect information.

80. On or about September 17, 2024, Plaintiff met with Dr. Caceres and Dr. Masangkay, with witnesses present, and requested medical leave. Plaintiff explained that she could not perform and that the restrictions were causing bias. Dr. Caceres denied the request, stated that Plaintiff "was supposed to graduate two years ago," and represented that the six-year rule barred additional leave.

81. In or about October 2024, Plaintiff's mental health counselor advocated for her, challenged the information Plaintiff had received concerning the six-year rule, and stated that Plaintiff was dysfunctional and distraught because of disparate treatment and was at a disadvantage because of disability exacerbations.

82. On or about October 8, 2024, Plaintiff spoke with Victim Advocate Candace Harrinarine and reported that she was extremely fearful for her safety, could not perform, and believed Dr. Caceres had repeatedly targeted her.

83. In or around October 2024, Defendants required Plaintiff to receive evaluations from pediatric attendings she had not selected, even though students ordinarily select which attendings provide evaluations. At least one such attending held a negative opinion of her because of repeated educational disturbances for which Defendants failed to provide context. Plaintiff was visibly distraught during the rotation, and the attending asked what was going on. Plaintiff told this attending that she did not feel safe at school, that she needed to take leave, and that she would schedule with OSA to do so. Multiple attendings and faculty expressed concern for Plaintiff, as she appeared exhausted, withdrawn, and distraught. Several recommended a medical leave and Plaintiff disclosed she tried but was told she could not by Dr. Caceres due to the 6-year rule.

84. Throughout the semester, faculty and staff, including Dr. Sutter, Dr. Ferris, Dr. Zahra, Ms. Guerra, and Ms. Santiago, contacted Dr. Caceres and reported that Plaintiff was distraught, unable to perform, or fearful at school. Ms. Santiago reported that Plaintiff became so distraught during the psychiatry shelf examination that she cried and had to excuse herself.

85. In or around November 2024, Plaintiff received "Unsatisfactory" ratings in OBGYN, Pediatrics, and Psychiatry. The psychiatry evaluations were inconsistent with what Plaintiff was told during the final week of the rotation; Plaintiff received passing pediatrics evaluations but was forced to obtain an additional evaluation from an attending she had not requested; and Plaintiff received strong OBGYN evaluations but was nevertheless rated "Unsatisfactory" based on performance on a written exam that she had not had time to prepare for due to frequent disruptions and distress from discrimination.

86. Before the OBGYN written exam, Plaintiff informed Defendants that she was facing issues other students were not subjected to, including a professionalism violation based on false claims, severe health issues, and a request for additional study time, as she had previously been told a medical withdrawal was not possible. Defendants provided minimal accommodations that were insufficient to address the additional trauma and lack of due process Plaintiff was struggling with, in addition to severe post-traumatic stress disorder symptoms. Defendants denied other reasonable accommodation requests for supportive measures such as delays for exams and for submitting assignments, despite Plaintiff citing discrimination, abuse, and deteriorating mental health leading to Plaintiff underperforming and her disability being exacerbated. Plaintiff also cited in her appeals that there were bias and significant deviations from the handbook/standard protocols for clerkships.

87. Defendants' actions during 2024, including the refusal to provide comparable protective

measures, failure to launch an interactive process, the use of unsubstantiated professionalism allegations, breaches of confidentiality, manipulation or disparate evaluations, disinformation and denial of reasonable accommodations, constituted discriminatory and retaliatory interference with her grades, clinical evaluations, and requests for medical leave.

88. In or around late November 2024, Plaintiff was contacted by the United States Department of Education for information collection during a pre-investigation. Plaintiff notified the investigator that she has been denied her rights as a student and stated there were several legal issues based on protected classes and that she did not feel safe at school.

89. In or about November 2024, Plaintiff was evaluated by the Physicians Resource Network while she remained on rotations. PRN confirmed severe post-traumatic stress disorder symptoms and questioned why Plaintiff was still rotating. Plaintiff explained that she had attempted to take medical leave but had been told by Dr. Caceres that the six-year rule barred leave. PRN thereafter removed Plaintiff from rotations because of the severity of her symptoms.

90. During her Spring 2025 appeals and committee hearings, Plaintiff stated that severe PTSD had prevented optimal performance and requested the opportunity to repeat the affected rotations.

91. During this time, Plaintiff encountered another student at the University who was also a victim of the same stalker (Forouhi). Plaintiff inquired whether this individual would be willing to participate in an investigation against the stalker should one be initiated. The individual expressed that it would be the appropriate action to protect other individuals and patients from their abuser; however, she conveyed concerns about potential retaliation and indicated her desire not to participate.

92. Around January 2025, several students and residents approached Plaintiff and stated that she should "watch her back" as there were several rumors circulating about her and that she was

being targeted.

93. On or about January 16, 2025, Plaintiff emailed Dr. Caceres and Dr. Masangkay regarding safety concerns and stated that she faced homelessness because of lost tuition money.

94. On or about January 17, 2025, Plaintiff was called into the FAU Police Department and was threatened and intimidated by police for reporting other students for harassment. Plaintiff had been forced to report the concerning and dangerous behavior of a classmate and then was called in and threatened despite all comments being true.

95. On or about January 23, 2025, Plaintiff again emailed Dr. Caceres and Dr. Masangkay regarding lost tuition money resulting from severe harassment.

96. On or about January 29, 2025, Plaintiff emailed Dr. Caceres and Dr. Masangkay concerning homelessness, lost tuition money, her removal from rotations, and her pending appeals. Plaintiff received no response to those January messages.

97. On or about February 4, 2025, Dr. Masangkay responded by citing the University's refund policy but did not mention other avenues through the university that would have assisted with her appeals, tuition, and safety. It became evident to Plaintiff later on that they were intentionally concealing information regarding the exceptional circumstances withdrawal that she would have filed due to significant impairment during rotations.

98. On or about February 14, 2025, during a telephone call, Plaintiff again told Dr. Caceres that she had been unable to perform because of the hostile environment and disability exacerbations and requested a retroactive medical withdrawal. Dr. Caceres denied that such an option existed.

99. On or about March 21, 2025, Plaintiff again expressly requested a retroactive medical withdrawal because PRN had removed her from rotations and she could not perform because of severe PTSD symptoms. Dr. Caceres again stated that no such option existed. Plaintiff later learned

that an exceptional-circumstances withdrawal process was available.

100. While on her surgical rotation, Plaintiff initiated an OCR9 investigation due to discrimination. Plaintiff filed the complaint prior to Forouhi and her friends graduating in May 2025. She urged the Title IX office to open an investigation and interview them. The OCR9 office allowed Plaintiff's stalker and her stalker's friends to graduate before being interviewed.

101. In or about March of 2025, Plaintiff requested through the OCR9 Office that a No Contact Order be placed between her and Dr. Caceres, as she felt there was a conflict of interest. This request was deemed unreasonable. The PRN also stated that if Plaintiff felt unsafe around Dr. Caceres, that she should request distance and a separate monitor to avoid conflicts of interest.

102. On or about April 10, 2025, Plaintiff received a phone call from Dr. Martinez regarding her surgical rotation. During the conversation, Dr. Martinez expressed frustration at the fact that Plaintiff opened an investigation against the College of Medicine.

103. In April 2025, Plaintiff spoke with members of the faculty including Dr. Shirazi, Dr. Goldman, and Dr. Foster about her situation. They revealed they had not been informed she had been aggressively stalked and harassed.

104. In May 2025, members of the MSPPSC committee stated that no students appeared due to cheating or harassment and they had no knowledge what had happened to Plaintiff, contrary to what Dr. Caceres had informed her for years.

105. Plaintiff discussed her situation with other members of the FAU community, including students and university employees, Ms. Lopez and Ms. Rootes, who disclosed that they were aware of Dr. Caceres discriminating against students. Several individuals provided examples of discriminatory conduct. Plaintiff inquired if these individuals were willing to come forward during the OCR9 investigation and they cited retaliation concerns but that they were happy to discuss

with an outside party. Witnesses including Dr. Jacomino, Dr. Sutter, and Ms. Rootes confirmed that the documentation Plaintiff submitted to Dr. Caceres were serious violations that went unaccounted for. Several of these witnesses questioned the reasoning for the deviation from the student code of conduct, student handbook, and standard protocols.

106. In or about December 2025, after contacting multiple University departments and explaining her circumstances, Plaintiff learned about the exceptional circumstances withdrawal process, a retroactive withdrawal option that, in prior communications, Dr. Caceres had stated did not exist.

107. In December 2025, an OCR9 investigation determination was issued, ruling in the University's favor, stating Plaintiff's complaint was unsubstantiated despite Plaintiff's documented evidence.

108. On or about April 9, 2026, Plaintiff requested the OCR9 investigation record.

109. On or about April 9, 2026, the OCR9 Office emailed Plaintiff a link to the investigation record. Although the investigation was delayed and key witnesses were unavailable because involved students had graduated, Plaintiff found documents and statements that she alleges corroborated her complaints, including the following:

i. A witness statement by Dr. Averkiou included the following: from the information disclosed to him, Plaintiff was about to be engaged in a sexual encounter with another female, and decided "at the last minute" that she was no longer a lesbian and did not want to engage in the encounter, and that Plaintiff further claimed she was sexually assaulted by that female. This account was inconsistent with Plaintiff's own reports and supports the inference that inaccurate and inappropriate information regarding Plaintiff's sexual assault and reporting circulated among faculty.

ii. That OCR 9 had contacted Forouhi, and when questioned, stated that she had never met the Plaintiff in person and did not "hang" with Plaintiff. Before OCR9 complete questioning, Forouhi declined to continue speaking on the matter and ended the phone call.

iii. That OCR 9 interviewed Dr. Martinez. Dr. Martinez had reiterated the information OCR9 had provided Plaintiff at the time of the denied request for a retaliation investigation in the summer of 2021. OCR9 and Dr. Martinez both stated that the College of Medicine investigated the group chat messages and that the matter had been resolved. Dr. Martinez specifically stated, "The incident regarding messages in the chat was investigated by the College of Medicine."

iv. That several faculty members, including Dr. Jacomino, Dr. Shirazi, Dr. Goldman, Dr. Holley, and Ms. Rootes, revealed that Plaintiff has been complaining of a hostile environment and the denial of an investigation.

v. That the investigator and OCR9 failed to collect significant documentation and interview several key witnesses, including Dr. Sutter, Dean Nelson and several students. Plaintiff had previously requested that OCR9 collect "jokes" from a school dance that revealed inquiries into her sexual history; these were not in the evidentiary file.

vi. That the investigation revealed the committee was not made aware of the harassment, and stalking occurring to Plaintiff and within the College of Medicine, supporting the inference that committee decisionmakers relied on inaccurate information, contributing to bias and lack of due process during her dismissal proceedings.

110. On or about April 13, 2026, a MSPPSC meeting was held, at which Plaintiff was told that Dr. Masangkay did not recall Plaintiff requesting medical leave during September 2024. Plaintiff stated she had multiple witnesses in the room and even told faculty and attendings the

disinformation she was told by Dr. Caceres. In addition, emails to the Office of Student Affairs were not responded and went unanswered which further corroborates deliberate indifference and retaliation.

111. In late 2025, Plaintiff sought medical leave again due to disability related concerns. For this request, Dr. Masangkay contacted her and guided her regarding the medical leave and ADA process, directly contradicting what Dr. Caceres had said in September of 2024 about the 6-year rule.

112. Due to Dr. Caceres repeatedly antagonizing Plaintiff, she had requested a no contact order March of 2025. An exceptional circumstances withdrawal would have been beneficial to Plaintiff during the Spring 2021 Semester when she was aggressively stalked by Forouhi and during Fall of 2021 when she withdrew due to safety concerns. In addition, all of her appeals for the clinical rotations cited her disability exacerbations from mistreatment during her psychiatry rotation, where residents were sexualizing patients, attendings forced her to do chores, violate HIPAA, and she was asked to write notes on patients she did not see.

113. The 2024 incidents were not isolated grievances, but the culmination of years of reports of harassment, stalking, sexual assault, cheating, retaliation, FERPA violations, and failures to provide a safe and nondiscriminatory learning environment.

114. The official Committee Members who voted on, approved, recommended, or supplied dispositive information for Plaintiff's dismissal were Dr. Patrick Grant (Chair), Dr. Faneece Embry, Dr. Ashley Beattie, Dr. Timothy Dye, Dr. Shonte Fraser-Damas, and FAU Legal Counsel: Audra Lazarus.

115. Before acting, each identified decisionmaker received or had access to Plaintiff's reports, accommodation requests, disability-based appeals, medical-leave and withdrawal requests, OCR9 communications, and committee submissions. The dismissal decision relied on academic deficiencies, professionalism proceedings, disputed evaluations, and unsatisfactory

rotation outcomes. The decisionmakers' prior knowledge, reliance on materials challenged through protected activity, refusal to correct or contextualize those materials, and the sequence of the proceedings connect the protected activity to the dismissal.

116. The Defendant nevertheless retained and relied on the challenged materials without correcting or contextualizing the effects of denied leave, disability exacerbations, disputed evaluations, and protected reports, and dismissed Plaintiff from the medical school program following the April 13, 2026 MSPPSC proceeding.

117. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to dismissal, intentional infliction of emotional distress, a formal diagnosis of post-traumatic stress disorder, exacerbation of her disability symptoms, loss of educational access, adverse academic records, tuition and fee losses, reputational harm, loss of career opportunities, and other related damages.

118. Defendant's stated reasons for dismissal do not defeat Plaintiff's claims because they were determined upon by the same academic and professionalism record that was influenced by discrimination, retaliation, failure to accommodate, breaches of confidentiality, and procedural irregularities.

119. Defendants created or failed to remediate hostile and inaccessible conditions, then treated the foreseeable effects of those conditions as neutral evidence of academic and professional unfitness.

120. Plaintiff's dismissal letter, therefore, supplies the adverse action and the stated rationale, while the surrounding chronology plausibly shows that the rationale was infected by protected reports, disability-related needs, disparate treatment, and biased or incomplete proceedings.

121. Defendant's assertion that Plaintiff had access to mentors does not resolve whether

Defendants provided equal access, reasonable accommodations, or a fair process. General access to faculty advisors was not a substitute for effective protective measures, disability-informed support, confidentiality, unbiased evaluations, or meaningful remediation of hostile educational conditions. Nor did the existence of mentors permit Defendants to disregard Plaintiff's reports, characterize her safety concerns as a disruption, or use resulting academic and professionalism consequences as grounds for dismissal.

**D. Retaliation Chronology and Decisionmaker Knowledge**

122. From August 2024 through dismissal in 2026, administrators and committees took adverse academic and professionalism actions after receiving her reports of mistreatment, disability-related accommodation requests, appeals, and OCR9 complaints. The chronology below identifies the protected activity, the persons or bodies with knowledge, the resulting adverse action, and the timing or other facts supporting but for causation.

123. On or about August 12 through 21, 2024, Plaintiff reported psychiatry rotation mistreatment to Dr. Caceres and Dr. Martinez and asked that the department not be contacted before evaluations because she feared prejudice. They nevertheless contacted the department and attendings. Nine days later, Plaintiff received an evaluation from an attending she had not selected, inconsistent with prior feedback, immediately before further promotion proceedings. Plaintiff alleges that direct knowledge, disregard of her request, intervening contact, timing, and later use of the evaluation support causation. (See ¶¶ 71-74)

124. On or about August 21 through 27, 2024, Dr. Caceres, Dr. Martinez, Dr. Averkiou, and the promotions committee knew of Plaintiff's objections to Mohammed's allegations, her psychiatry complaint, and the disputed evaluation. Dr. Averkiou's August 16 statement reflected acceptance of Mohammed's accusations and hostility toward Plaintiff's response. Six days after the disputed

evaluation, the committee referred Plaintiff to PRN based on the professionalism allegation and evaluation. The known objections, statement, timing, and reliance on challenged materials support a causal connection. (See ¶¶ 68-75)

125. In or about August through September 2024, Plaintiff notified OCR9 that Mohammed was spreading rumors despite a No Contact Order and that the hostile environment was disrupting her education. During the same period, professionalism and academic proceedings continued, and the University issued the September 16 letter characterizing reported resident conduct as constructive criticism and requiring Plaintiff to sign inaccurate information. OCR9's direct notice, the close sequence, and the refusal to credit reported mistreatment support the but for retaliatory causation. (See ¶¶ 76-77.)

126. In or about September 17 through November 2024, Plaintiff requested medical leave from Dr. Caceres and Dr. Masangkay, with witnesses present, because disability exacerbations prevented performance. Dr. Caceres denied leave and invoked the school's six-year rule. Plaintiff's counselor, faculty, and staff subsequently notified Dr. Caceres that Plaintiff was distraught, unable to perform, or fearful at school. Plaintiff remained in rotations, additional evaluations were obtained, and unsatisfactory outcomes followed before PRN confirmed severe PTSD symptoms and removed her. Plaintiff alleges that repeated notice, denial, ensuing evaluations, and PRN's intervention support causation. (See ¶¶ 79-87.)

127. In or about Spring 2025, Plaintiff's written appeals and committee presentations stated that severe PTSD prevented optimal performance and requested repetition of affected rotations. The appeals committee members therefore had direct notice. The challenged outcomes were not reversed or contextualized and remained available for later proceedings. The receipt of Plaintiff's appeals, retention of the challenged record, and later reliance on it connect her protected activity

to continuing adverse consequences. (See ¶ 88; see also ¶¶ 113-117)

128. In or about March through April 2025, Plaintiff initiated an OCR9 discrimination investigation and requested a No Contact Order involving Dr. Caceres because of conflict. OCR9 had direct notice. On or about April 10, Dr. Martinez expressed frustration that Plaintiff had opened an investigation against the College of Medicine, demonstrating knowledge and antagonism. The overlap among the investigation, surgical rotation treatment, and continuing committee proceedings supports but for causation. (See ¶¶ 99–102)

129. In April 2026, before and during the April 13 MSPPSC proceeding, Plaintiff requested the OCR9 record and raised disability, hostile environment, medical leave, accuracy, and procedural objections. The MSPPSC members present therefore had direct notice before dismissal. The record retained disputed evaluations, professionalism materials, and unsatisfactory outcomes created after protected reports and accommodation requests. The contemporaneous notice, failure to correct or contextualize those materials, and reliance on them support an inference that protected activity was a but-for cause of the dismissal or of the uncorrected record on which dismissal was based. (See ¶¶ 106–117)

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

## DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND DENIAL OF EQUAL ACCESS

### (Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.)

130. Plaintiff incorporates paragraphs 3-14, 59-63, 71-88, 91-96, 109-117, and only those allegations concerning Plaintiff's disability, requests for reasonable accommodations and supportive measures, disability and trauma-related educational impacts, professionalism proceedings, clinical-rotation harm, dismissal from the medical school program, and resulting

damages, as though fully set forth herein.

131. Although Defendants later acknowledged Plaintiff's disability and approved certain testing accommodations, those measures did not address the full scope of Plaintiff's disability access needs. In addition, Plaintiff requested protection from hostile encounters, separation from individuals connected to harassment and assault, confidentiality, informed disability academic considerations, and a process that would not treat prior trauma manifestations as misconduct. Defendants' limited exam accommodations failed to provide Plaintiff with reasonable, effective, and individualized access to the academic and clinical environment.

132. Plaintiff is a qualified individual with a disability under Title II of the ADA.

133. Plaintiff was otherwise qualified to participate in the medical program because she completed prior coursework, passed Step 1 with accommodations, began clinical rotations, and initially received favorable outpatient evaluations. She did not request waiver or reduction of essential academic or clinical standards. She requested finite medical leave, disability-related withdrawal from rotations undertaken while medically impaired, and an opportunity to repeat affected rotations after stabilization so that she could satisfy the same academic and clinical standards applied to other students.

134. Defendants knew or should have known of Plaintiff's disability and disability related needs.

135. Plaintiff requested specific disability-related accommodations, including medical leave on September 17, 2024; additional time for examinations and assignments during documented symptom exacerbations; withdrawal from rotations undertaken while medically impaired; and an opportunity to repeat affected rotations after stabilization. She made the September 17 request to Dr. Caceres and Dr. Masangkay with witnesses present, renewed the withdrawal request to Dr.

Caceres on February 14 and March 21, 2025, and raised the disability-based request in her Spring 2025 appeals. Each request identified inability to perform because of disability exacerbations and sought a finite measure that would permit her to return and satisfy ordinary program standards.

136. Defendants denied, delayed, failed to implement, and failed to engage in a meaningful interactive process regarding Plaintiff's requests for reasonable accommodations and supportive measures.

137. Defendants treated Plaintiff's disability and trauma manifestations as misconduct and professionalism deficiencies rather than as circumstances requiring reasonable accommodation, individualized assessment, and equal access.

138. Defendants excluded Plaintiff from participation in, and denied her the benefits of, its public programs, services, and activities, and otherwise subjected Plaintiff to discrimination by reason of her disability, including by treating disability and trauma-related needs as concerns regarding her professionalism, and by failing to provide reasonable accommodations necessary for equal access.

139. Prior to dismissing Plaintiff, Defendants were required to evaluate whether she could meet program requirements with reasonable accommodations and without discrimination or retaliation. Instead, Defendants treated the accumulated record as dispositive without adequately separating legitimate academic concerns from disability related needs, trauma-related impacts, protected reports, retaliatory consequences, and biased and incomplete evaluations. Defendants' failure to conduct a fair and individualized assessment supports Plaintiff's ADA claims.

140. As a result of the foregoing, Plaintiff was dismissed from the program on or about  due to her disability in violation of the ADA.

141. Plaintiff duly appealed her dismissal and the final decision dismissing her from the program

was received on July 1, 2026

142. As a direct and proximate result of Defendant's conduct, Plaintiff suffered and continues to suffer damages, including, but not limited to, dismissal from the medical school program, educational disruption, emotional distress, financial losses, reputational harm, and loss of educational and career opportunities.

## **COUNT II**

### DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND DENIAL OF EQUAL ACCESS

**(Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)**

143. Plaintiff incorporates paragraphs 3-14, 59-63, 71-88, 91-96, 109-117, and only those allegations concerning Plaintiff's disability, requests for reasonable accommodations and supportive measures, disability and trauma related educational impacts, professionalism proceedings, clinical-rotation harm, dismissal from the medical school program, and resulting damages, as though fully set forth herein.

144. Defendant received federal financial assistance and operated an education program or activity within the meaning of Section 504.

145. Plaintiff is an individual with a disability and was otherwise qualified to participate in Defendant's medical-education program because she completed prior coursework, passed Step 1 with accommodations, began clinical rotations, and initially received favorable outpatient evaluations. Plaintiff did not request waiver or reduction of essential academic or clinical standards; she requested finite measures that would allow her to return after stabilization and satisfy those standards.

146. Defendants knew or should have known of Plaintiff's disability and disability-related needs.

147. Plaintiff requested specific disability-related accommodations necessary to access Defendant's academic and clinical programs, including medical leave on September 17, 2024; additional time for examinations and assignments during documented symptom exacerbations; withdrawal from rotations undertaken while medically impaired; and an opportunity to repeat affected rotations after stabilization. Plaintiff communicated that these finite measures were required because disability exacerbations prevented performance and would allow her to return and satisfy ordinary program standards.

148. Defendants denied, delayed, failed to implement, and failed to engage in a meaningful process regarding Plaintiff's requests for reasonable accommodations and supportive measures.

149. Defendants treated Plaintiff's disability- and trauma-related manifestations as misconduct and professionalism deficiencies rather than as circumstances requiring reasonable accommodation, individualized assessment, and equal access.

150. As a result of the foregoing, Plaintiff was dismissed from the program due to her disability in violation of the ADA.

151. Plaintiff duly appealed her dismissal and the final decision dismissing her from the program was received on July 1, 2026.

152. Defendants' conduct excluded Plaintiff from participation in, denied her the benefits of, and otherwise subjected her to discrimination under Defendants' federally funded education programs and activities solely by reason of Plaintiff's disability.

153. As a direct and proximate result, Plaintiff suffered and continues to suffer damages, including, but not limited to, dismissal from the medical school program, educational disruption, emotional distress, financial losses, reputational harm, and loss of educational and career opportunities.

## COUNT III

## SEX DISCRIMINATION, SEXUAL ASSAULT, AND DELIBERATE INDIFFERENCE

## (Title IX, 20 U.S.C. § 1681 et seq.)

154. Plaintiff incorporates paragraphs 6, 12, 14, 22, 27-43, 44-58, 64-66, 70-74, 84-87, 89-93, 96-100, and 104-107, and only those allegations concerning sex-based harassment, stalking, sexual assault, hostile educational conditions, Plaintiff's reports to Defendant, requests for protection and separation, Defendant's response, continued vulnerability to harassment, dismissal from the medical school program, and resulting damages, as though fully set forth herein.

155. Defendant receives federal financial assistance and is subject to Title IX.

156. Plaintiff was subjected to sex-based harassment, stalking, and sexual assault, as well as a hostile educational environment connected to those events.

157. Defendants and their agents had actual notice of Plaintiff's reports of sex-based harassment, stalking, sexual assault, and hostile educational conditions, as well as Plaintiff's requests for protection, separation, and support.

158. Defendants' response was clearly unreasonable in light of known circumstances because Defendants failed to provide effective protective measures, failed to prevent continued hostile conditions, and characterized Plaintiff's safety requests as disruptive.

159. Defendants' deliberate indifference caused Plaintiff to undergo harassment or made Plaintiff vulnerable to further harassment and deprived Plaintiff of equal access to educational benefits and opportunities.

160. As a direct and proximate result of Defendants' deliberate indifference and sex-based discriminatory conduct, Plaintiff suffered and continues to suffer damages, including, but not

limited to, dismissal from the medical school program, educational disruption, emotional distress, financial losses, reputational harm, and loss of educational and career opportunities.

**COUNT IV**

**RETALIATION**

**(Title IX, 20 U.S.C. § 1681 et seq.)**

161. Plaintiff incorporates paragraphs 6, 12, 14, 22-23, 27, 29-31, 33-45, 47-50, 52-58, 64-65, 68-74, 79-82, 84-87, 89-100, 103-107, and only those allegations concerning Plaintiff's reports of sex-based harassment, stalking, sexual assault, hostile educational conditions, requests for protection and separation, Defendant's knowledge of those protected reports, subsequent adverse academic and professionalism actions, dismissal from the medical school program, and resulting damages, as though fully set forth herein.

162. Plaintiff engaged in protected activity under Title IX by reporting sex-based harassment, stalking, sexual assault, and hostile educational conditions; requesting protection, separation, and support; participating in Title IX-related communications; and opposing conduct she reasonably believed violated Title IX.

163. Defendants knew or should have known of Plaintiff's Title IX protected activity.

164. Following Plaintiff's Title IX protected activity, Defendant subjected her to adverse actions, including but not limited to adverse professionalism reports, referral to competency committees, negative and biased treatment in academic and clinical evaluations, denial of protective measures, breach of confidentiality, refusal to correct or contextualize academic records, dismissal from the medical school program, and other conduct that would dissuade a reasonable student from reporting sex discrimination or seeking Title IX protections.

165. The timing, pattern, and disparate nature of Defendants' actions support an inference that

Defendant subjected Plaintiff to adverse academic, professionalism, evaluation, confidentiality, and dismissal-related actions was directly caused by Plaintiff's protected activity. But for Plaintiff's protected activity she would not have been subjected to the adverse academic, professionalism, evaluation, confidentiality, and dismissal-related actions.

166. As a result of the foregoing, Plaintiff was dismissed from the program due to her disability in violation of the ADA.

167. Plaintiff duly appealed her dismissal and the final decision dismissing her from the program was received on July 1, 2026.

168. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered and continues to suffer damages, including, but not limited to, dismissal from the medical school program, educational disruption, emotional distress, financial losses, reputational harm, and loss of educational and career opportunities.

**COUNT V**

**RETALIATION**

**(ADA, 42 U.S.C. § 12203)**

169. Plaintiff incorporates paragraphs 13-14, 59-60, 78-88, 95-101, 109-117; see also Retaliation Chronology, supra 121-128, and only those allegations concerning Plaintiff's disability, requests for reasonable accommodations and supportive measures, opposition to disability discrimination, Defendant's knowledge of that protected activity, subsequent adverse academic and professionalism actions, dismissal from the medical school program, and resulting damages, as though fully set forth herein.

170. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations and supportive measures, seeking equal access to Defendant's academic and

clinical programs, reporting disability discrimination and disability-related mistreatment, and opposing practices she reasonably believed violated the ADA.

171. After Plaintiff engaged in ADA protected activity, Defendant subjected Plaintiff to adverse actions, including but not limited to adverse professionalism reports, referral to competency committees, negative and biased treatment in academic and clinical evaluations, denial or delay of accommodations and supportive measures, breach of confidentiality, refusal to correct or contextualize academic records, dismissal from the medical school program, and other conduct that would dissuade a reasonable student from requesting accommodations or opposing disability discrimination.

172. After Plaintiff requested disability-related medical leave from Dr. Caceres and Dr. Masangkay on September 17, 2024, those administrators had actual knowledge of her protected request. Defendant denied leave, kept Plaintiff in rotations despite repeated faculty and provider notice that she could not perform, obtained additional evaluations, retained the resulting unsatisfactory outcomes, and used that record in later proceedings. Plaintiff renewed disability-related requests in her Spring 2025 appeals and in her February 14 and March 21, 2025 withdrawal requests. The officials and committees receiving those submissions had actual knowledge before retaining or relying on the challenged record. The direct notice, sequence of adverse actions, departure from the treatment of other students, and continued use of the disputed record support a reasonable inference that the protected requests were a but-for cause of at least the refusal to correct the record and its use in later proceedings.

173. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered and continues to suffer damages, including, but not limited to, dismissal from the medical school, educational disruption, emotional distress, financial losses, reputational harm, and loss of

educational and career opportunities.

## COUNT VI

## RETALIATION

**(Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)**

174. Plaintiff incorporates paragraphs 6, 13-14, 59-60, 78-88, 95-101, 109-117; see also Retaliation Chronology, supra 121-128, and only those allegations concerning Plaintiff's disability, requests for reasonable accommodations and supportive measures, opposition to disability discrimination, Defendant's receipt of federal financial assistance, Defendant's knowledge of that protected activity, subsequent adverse academic and professionalism actions, dismissal from the medical school program, and resulting damages, as though fully set forth herein.

175. At all relevant times, Defendant received federal financial assistance and was subject to Section 504 of the Rehabilitation Act.

176. Plaintiff engaged in protected activity under Section 504 by requesting reasonable accommodations and supportive measures, seeking equal access to Defendant's federally funded education program, reporting disability discrimination and related mistreatment, and opposing practices she reasonably believed violated Section 504.

177. Defendants knew or should have known of Plaintiff's Section 504-protected activity.

178. After Plaintiff engaged in protected activity, Defendant subjected Plaintiff to adverse actions, including but not limited to adverse professionalism reports, referral to competency committees, negative and biased treatment in academic and clinical evaluations, denial or delay of accommodations and supportive measures, breach of confidentiality, refusal to correct or contextualize academic records, dismissal from the medical school program, and other conduct that would dissuade a reasonable student from requesting accommodations or opposing disability

discrimination.

179. The timing, pattern, and disparate nature of Defendants' actions support an inference that Defendants subjected Plaintiff to adverse actions related to academics, professionalism, evaluations, confidentiality, accommodations, and dismissal because of Plaintiff's Section 504-protected activity. But for her protected activity, Plaintiff would not have been subjected to adverse actions related to academics, professionalism, evaluations, confidentiality, accommodations, and dismissal.

180. As a result of the foregoing, Plaintiff was dismissed from the program on or about due to her disability in violation of the ADA.

181. Plaintiff duly appealed her dismissal and the final decision dismissing her from the program was received on

182. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered and continues to suffer damages, including, but not limited to, dismissal from the medical program, educational disruption, emotional distress, financial losses, reputational harm, and loss of educational and career opportunities.

**COUNT VII**

**BREACH OF CONTRACT**

**(Florida Contract Law)**

183. Plaintiff incorporates paragraphs 11-14, 39-43, 48-61, 67-88, 93-117, and only those allegations concerning Plaintiff's enrollment, tuition and fees, Defendant's published policies and procedures, promised academic and disciplinary processes, accommodation and nondiscrimination obligations, confidentiality obligations, professionalism and mistreatment procedures, medically necessary leave, dismissal from the medical school program, and resulting contractual damages,

as though fully set forth herein.

184. Plaintiff and Defendant entered into an educational contractual relationship through her enrollment, payment of tuition and fees, acceptance of academic requirements, Defendant's publications, policies, handbooks, procedures, accommodation processes, anti-discrimination policies, student mistreatment policies, professionalism standards, and related written materials.

185. Plaintiff and Defendant entered into an express written agreement through the Charles E. Schmidt College of Medicine Medical Student Handbook. The agreement expressly required Defendant to maintain the provisions of Student Handbook, including the Student & Faculty Conduct & Responsibility, Behavioral Requirements & Standards, Student Mistreatment Policy, Discrimination and Harassment Policy, Conflict of Interest in Academic Evaluation of Students by Faculty Policy, Academic Remediation, Academic Grievances, Appeals Policy, Voluntary Leave of Absence Policy, Medical Student Performance Evaluations Policy and Procedure, Medical Student Wellness. Defendant breached these express provisions.

186. Upon information and belief, upon Plaintiff's enrollment, both parties expressly agreed to uphold the conditions set forth within the Medical School Student Handbook.

187. Defendant breached its contractual agreement with Plaintiff by failing to follow its own published policies and procedures; failing to provide fair and consistent academic, professionalism, mistreatment, and disciplinary processes; failing to protect confidentiality; failing to conduct a fair individualized review before dismissal; failing to fairly evaluate and contextualize Plaintiff's academic record; dismissing Plaintiff from the medical program based on a record of questionable validity; and refusing equitable relief related to Plaintiff's medically necessary leave.

188. As a result of the foregoing, Plaintiff was dismissed from the program on or about  due to her disability in violation of the ADA.

189. Plaintiff duly appealed her dismissal and the final decision dismissing her from the program was received on

190. As a direct and proximate result of Defendant's breaches of its contractual agreement with Plaintiff, Plaintiff suffered and continues to suffer damages, including, but not limited to, tuition and fee losses, educational delay, dismissal from the program, academic and professional harm, emotional distress, reputational harm, and other consequential damages.

**DAMAGES**

191. As a result of Defendant's unlawful and wrongful conduct, Plaintiff suffered and continues to suffer damages, including dismissal from the medical school program, loss of educational access and opportunity, educational delay, tuition fee losses, emotional distress, exacerbation of disability-related symptoms, reputational harm, financial loss, and loss of career opportunities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, jointly and severally as permitted by law, and award all legal, equitable, declaratory, injunctive, monetary, and other relief available under law, including the following:

a. A declaration that Defendant violated Plaintiff's rights under Title IX, Title II of the ADA, Section 504, and the ADA and Section 504 anti-retaliation provisions, and breached the educational contractual relationship under applicable Florida contract law;

b. An injunction requiring Defendant to reinstate Plaintiff to the medical school program, or otherwise restore Plaintiff's access to medical education, with reasonable accommodations, effective supportive measures, corrected or contextualized records as necessary, and nonretaliatory conditions necessary for equal access;

c. An injunction requiring Defendant to correct, remove, seal, or expunge Plaintiff's

dismissal and any other adverse academic, disciplinary, evaluation, and/or educational records affected by Defendant's discrimination, retaliation, failure to accommodate, or breach of their policies;

d. An injunction prohibiting Defendant from further adverse treatment of Plaintiff, including retaliation, discriminatory treatment, hostile-environment conduct, and breaches of confidentiality;

e. Compensatory damages to the extent permitted by the statutes and causes of action pleaded, including damages for educational disruption, loss of access and opportunity to fair and equal education, financial loss, reputational harm, and loss of career opportunities;

f. Reimbursement, restitution, or other equitable monetary relief for tuition, fees, educational delay, and other financial harm caused by Defendant's conduct;

g. Pre-judgment and post-judgment interest to the extent permitted by law;

h. Reasonable attorneys' fees, costs, and disbursements incurred in this action; and

i. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP, P.C.
*Counsel for Plaintiff*
2005 W. Cypress Creek Road, Suite 104B
Fort Lauderdale, FL 33309
Tel.: (212) 792-9670
Fax: (844) 636-2021

By: *<u>/s/ Stewart Lee Karlin</u>*
Stewart Lee Karlin, Esq.
Florida Bar No.: 961159
slk@stewartkarlin.com

**I HEREBY CERTIFY** that on this 2nd day of October, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record id via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for counsel or parties not authorized to receive an electronic Notice of Electronic Filing.

Dated: Fort Lauderdale, Florida
October 2, 2026

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP, P.C.
*Counsel for Plaintiff*
2005 W. Cypress Creek Road, Suite 104B
Fort Lauderdale, FL 33309
Tel.: (212) 792-9670
Fax: (844) 636-2021

By: *<u>/s/ Stewart Lee Karlin</u>*
Stewart Lee Karlin, Esq.
Florida Bar No.: 961159
slk@stewartkarlin.com