**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:24-cv-81208-AHS

| | |
|---|---|
| LISA CERRA as Minor's Parent, on behalf of N.C., a minor, | ) |
| Plaintiff, | ) |
| v. | ) |
| THE SCHOOL DISTRICT OF PALM BEACH COUNTY, FLORIDA, PALM BEACH SCHOOL FOR AUTISM, INC., | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR JUDGMENT**
**ON THE ADMINISTRATIVE RECORD**

Lisa Cerra ("Plaintiff"), pursuant to Rule 52 of the Federal Rules of Civil Procedure and by order of this Court, moves the Court to review the administrative record and, in support, state as follows:[1]

**NATURE OF THE PROCEEDING**

The proceeding is an appeal pursuant to the Individual with Disabilities Act ("Hereinafter" IDEA (20 U.S.C. § 1415 (I) (2) (a)) from a final decision dated July 2, 2024 of the State of Florida, Division of Administrative Hearings. (DOAH) (R1706-1724)

The Plaintiff filed a request for a due process hearing on or about August 26, 2022.. Thereafter, on or about April 16, 2023, Plaintiff filed an amended due process hearing request. The due process hearing was held on April 29 and 30, 2024. Plaintiff presented the testimony of Dr. Morgan Koepper, an expert in pediatric and clinical neuropsychology; and the student's

[1] The references are to the bate stamped page numbesr from the Administrative Record filed with the Court (ECF No.63).

mother. The School Board presented the testimony of Ann Eisenberg, Executive Director for Palm Beach School for Autism (PBSA); Katie Devivo, the student's private tutor; Allison Ballin, PBSA's behavior analyst; and Amy Fleming, Special Education Coordinator at Palm Beach Central High School.. The decision was rendered on or about July 2, 2024. (R1706-1724). The issues developed at the hearing were as follows:

**ISSUE PRESENTED FOR REVIEW**

1. Whether the PALM BEACH COUNTY SCHOOL BOARD ("The District" or "School Board") failed to provide a free appropriate public education ("FAPE") to Plaintiff because the decision to place Plaintiff in a more restrictive setting violated the least restrictive environment ("LRE") requirements of the Individuals With Disabilities Education Act ("IDEA")
2. Whether not evaluating N.C. for over a decade violated IDEA and denied N.C. FAPE.

**DOAH DECISION**

In a decision dated July 2, 2024, DOAH held that the IEP was a FAPE and The ALJ held that the preponderance of the evidence demonstrated that the student required levels of support and services that were offered to him at PBSA. The focus on ABA therapy to address his maladaptive behaviors was key to his current success in a general high school and was a priority educational need to access FAPE. Year after year, the IEP teams, which included the parents, agreed that placement at PBSA was the proper placement for the student to receive FAPE. Placement at PBSA offered the student FAPE, evidenced by his current success in a mainstreamed environment. The same analysis applies to the Access Points curriculum; that is, the student received FAPE on that curriculum, evidenced by his ability to achieve satisfactory grades in high school, while being instructed using grade level material.. This decision was the final state decision under the IDEA. (R1706-1724) This proceeding is an appeal pursuant to the Individual

with Disabilities Act ("Hereinafter" IDEA (20 U.S.C. § 1415 (I) (2) (a)) from a final decision dated August 12, 2024, of the State of Florida, Division of Administrative Hearings. (DOAH).

## STATEMENT OF MATERIAL FACTS FROM THE ADMINISTRATIVE RECORD

1. This matter is before DOAH on Plaintiff's request for a due process hearing (Complaint), initially filed on or about August 26, 2022, by and filed an Amended Request for Due Process on or about February 16, 2023, which was the operative complaint at DOAH. The final hearing took place on April 29, 2024 and April 30, 2024.

2. Plaintiff presented the testimony of Dr. Morgan Koepper, expert witness, and Lisa Cerra, parent of N.C. Dr. Morgan Koepper was tendered as an expert witness in the area of qualified expert witness in the field of pediatric and regular neuropsychology. and was accordingly accepted, without objection, by the Court. (T.33) (R33-0135).

3. Plaintiff's Exhibit 1, 2, 3, and 5 were admitted into the record. (R1662-1691) (AR1692-1723) (R1724-1824) (R1790-1824)

4. The District presented the testimony of Ann Eisenberg, Executive Director of the Palm Beach School for Autism, Katie Devivo, Teacher and Reading tutor of Palm Beach Central High School, Allison Ballin, Director of Exception Student Education of the Palm Beach School for Autism, and Amy Fleming, ESE Coordinator for Palm Beach Central High School (R283-0407)

5. The parties submitted Joint Exhibit 1 through 43, which were admitted into the record.

6. N.C. is a student, who, at all time material hereto, has been enrolled at the District's schools. (R0016)

7. N.C. was initially made eligible for ESE services in or around August of 2010. See Plaintiff's Exhibit 1 (NC0004); see also (T. 141) (R0141). N.C. was approximately three (3) years old at this

time (T. 141) (R0141).

8. N.C. received ESE services for eligibilities of Autism Spectrum Disorder, Language Impaired, Speech Impaired and Occupational Therapy. See Plaintiff's Exhibit 1. (R0653-683)

9. N.C. was enrolled in the Palm Beach School for Autism, due to his diagnosis of autism spectrum disorder (T. 142) (R0142).

10. The Palm Beach School for Autism is a charter school operating under the charter of Palm Beach County School Board (T. 261) (R0286).

11. At all times material hereto, the Palm Beach School for Autism did not provide a general education curriculum (T. 200). Instead, it provides for a modified curriculum that is colloquially referred to as Access Points. (R077)

12. Access Points are "academic expectations written specifically for students with significant cognitive disabilities. As part of the Florida Standards, access points reflect the core intent of the standards that apply to all students in the same grade, but at reduced levels of complexity. Access courses are designed to provide students with a significant cognitive disability with access to the general curriculum." See Plaintiff's Exhibit 1 (NC0004). They are essentially a watered-down version of the Florida Standards general education curriculum. (T. 77) (R077).

13. A general education curriculum is a less restrictive environment than Access Points (T. 273 – 274) (R0298-299).

14. Additionally, at all times material hereto, the Palm Beach School for Autism was, in and of itself, a significantly more restrictive environment, only serving students with autism (T. 274) (R0299).

15. On December 1, 2016, when N.C. was in third grade, the Defendants held an IEP meeting to place N.C. on Access points curriculum. No updated evaluations were done prior to this decision.

The present levels on N.C.'s IEP at the time of the move to Access Points curriculum reflected that he was reading fluently at a second-grade level. A curriculum goal was developed to answer second-grade comprehension questions which at the time, was one year behind grade level.(R0145-0148) (R1872)

16. N.C. remained on Access points for the duration of his enrollment at the PBSA.(R0148-0149)

17. The information provided to Plaintiff regarding N.C.'s placement on Access points was incomplete at best, misleading at worst. Plaintiff was advised that N.C. needed to remain at PBSA and would fail in a different setting due to his behaviors. Plaintiff was advised placement on Access curriculum was required to remain at PBSA. A review of the charter and IDEA, however, supports that PBSA was in fact supposed to provide students with both standard and Access curriculum, depending on the student's needs. The pattern and practice at PBSA to place all students on Access curriculum denied N.C. an individualized education plan reasonably calculated to provide educational benefit. Plaintiff would not have consented to the continued IEP without reevaluation if not for the N.C.'s IEP team's misrepresentations. (R0148-0152)

18. The Defendants lacked sufficient data and failed to present such data to Plaintiff supporting their decisions to waive N.C.'s reassessments at the time of each decision. Likewise, the Defendants encouraged waiving N.C.'s reassessments despite knowing and/or having data showing incremental progress. (R0725)

19. The Defendants failed to reassess N.C. for twelve years. In doing so, the Defendants maintained that the level of support N.C. needed to make progress in school did not change whatsoever over a twelve- year period, despite having data supporting otherwise. (R0725)

20. By ninth grade, present levels on his IEP showed that N.C. was only able to answer second grade reading comprehension questions. He was struggling to answer open-ended questions at the

fifth-grade level. Thus, at best, after approximately six years on Access curriculum, (R0725)

21. N.C. was now performing at more than four years behind in this academic area. (R0725)

22. N.C. received only instruction on curriculum meant for children with intellectual disabilities and was withheld from general education classes and curriculum. As a result, N.C. began to adopt tendencies and behaviors from his disabled classmates that he otherwise would not have if he was in a general education classroom. (R0725)

23. In Jan. 2022 evaluation, after 12 years of not re-evaluating N.C., the Defendants finally conducted a psycho-educational evaluation. N.C.'s General Conceptual Ability was a 92, within the average range. His academic testing, however, was in the below average to low range. (R0725)

24. This discrepancy between his cognitive ability and his academic knowledge, as well as the gap widening between N.C. and his non-disabled peers, is due to the failure to provide a FAPE, inappropriately placing N.C. on Access curriculum, not providing instruction commensurate with his cognitive ability, and failing to evaluate him for twelve (12) years. (R0725)

25. The Defendants had not considered or conducted evaluations which were necessary to develop a fully informed and individualized IEP reasonably calculated to meet N.C.'s needs and make progress, including evaluations which would assess N.C.' behavioral, social/emotional or independent functioning levels. (R0519)

26. N.C. was not provided instruction by an ESE teacher as required by his IEP during the time period of January 20, 2022, through May 26, 2022. (R0519)

27. Specifically, school records do not reflect any form of cognitive testing taking place in or around N.C.'s third grade school year. See Plaintiff's Exhibit 1 (NC00017) (R1662-1691).

28. Additionally, N.C.'s placement on Access Points is contrary to data collected and ascertainable in the various IEP's collected in the years prior, which indicated steady

improvement and growth in his education. This includes performing at or above grade level prior to his placement in the more restrictive environment, that being access point (T. 84) (R084).

29. In fact, the greater weight of the evidence indicates that N.C. did not meet the criteria for Access Points long before the School District's documentation confirming same in May of 2022, as there was little to no evidence of significant cognitive impairment at the time he was placed on Access Points through 2022. See Plaintiff's Exhibit 1 (NC00019), and should have been placed in a less restrictive environment. (R2230)

30. At no point prior to January of 2022, did Defendants review Access Points curriculum with N.C.'s parents (T. 145) (R0145)

31. In fact, at the various IEP meetings N.C.'s parents made clear that N.C. had to remain at the Palm Beach School for Autism (T. 150 – 151) (R0150-151).

32. In fact, at the various IEP meetings N.C.'s parents had, it was made clear that N.C. had to remain at the Palm Beach School for Autism (T. 150 – 151) (R0150-151)..

33. Updates concerning Access Points standards were made in or around July of 2021, when the State Board amended Rule 6A-1.0943, Florida Administrative Code. Specifically, the State Board established a definition for significant cognitive disability. That being "A statistically significant below-average global cognitive score that is within the first percentile rank (i.e., a standard, full-scale score of 67 or under);"

34. Ultimately, it wasn't until N.C. was reevaluated, which occurred after the updated to Rule 6A-1.0943, Florida Administrative Code, was it determined that N.C. no longer qualified for Access Points because he did not have a significant cognitive disability or impairment, demonstrated by the fact that his IQ was above a 67 (T.321 – 322). N.C. was removed from the Palm Beach School for Autism.(R0346-347).

35. N.C. subsequently enrolled at Potentia Academy, which was not a good fit for N.C. (T. 156)(R0156).

36. N.C. thereafter enrolled at Palm Beach Central High School and was enrolled there at the time of the administrative hearing (T.159) (R0159). Subsequently, N.C. completed his 11th and 12th-grade years at Dr. Joaquin, successfully graduated in May 2026, and transitioned to college in August 2026 (T. 159) (R0159).

37. N.C. has been on a general education curriculum since leaving the Palm Beach School for Autism and has had a very positive experience (T. 159 - 160) (R0159-0160).

38. He is performing well academically, which is indicative that he did not have a significant cognitive impairment prior to his removal from Access Points. See Plaintiff's Exhibit 1 (NC0019) (R1662-1691).

39. N.C. requires ongoing weekly therapy to mitigate the long-term educational and developmental harm caused by his prolonged placement in a restrictive environment. Because N.C. has since graduated high school and entered college, these deficits manifest more severely under a higher-level curriculum, necessitating intensive independent academic tutoring, advanced educational coaching, and specialized mental health therapy outside of a traditional K-12 school setting.(NC0021) (R1662-1691).

**WHEREFORE**, Plaintiff requests this Court enter an order and judgment that Defendant violated the IDEA, a declaration that the School District has violated Plaintiff's rights under IDEA, Enter an Order requiring the Defendants to provide Plaintiff's the relief sought by Plaintiff, on behalf of N.C., at the impartial due process hearing .Enter an Ordering requiring the Defendants to make the Plaintiffs whole by awarding N.C. compensatory education and/or the educational services she would have received in the absence of the Defendants' unlawful conduct.

Enter an Ordering requiring the Defendants to make the Plaintiffs whole by awarding N.C. compensatory damages for the Defendants' unlawful conduct.Award Ms. Cerra reasonable attorney fees and costs in reimbursement for all time spent pursuing the instant litigation and award Plaintiffs such relief as the Court deems appropriate.

## MEMORANDUM OF LAW IN SUPPORT

## STANDARD OF REVIEW

The standard of review is specific to consideration of administrative decisions under the IDEA. The Act envisions an independent ruling based on a preponderance of the evidence, with the majority of the evidence coming from the records of the administrative hearing. Manecke v. Sch. Bd., 762 F.2d 912, 919 (11th Cir. 1985). The extent of deference to be given the administrative findings of fact is left to the discretion of the court. Jefferson Cty. Bd of Educ. v. Breen, 853 F.2d 883, 857 (11th Cir. 1988), relying on Town of Burlington v. Dep't of Educ. v. Com. of Mass., 736 F.2d 773, 792 (1st Cir.1984), aff'd, 471 U.S. 359 (1985). While district courts must consider the administrative findings of fact, they are free to accept or reject them. Id. n.2 (decision described as "bounded, independent decision ... bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."); Town of Burlington, 736 F.2d at 791. While a reviewing court must presume that findings of fact are prima facie correct, M.M. v. Sch. Bd. of Miami-Dade Cnty., 437 F.3d 1085, 1097 (11th Cir. 2006), a district court must accept the conclusions that are supported by the record but reject those that are not. R.L. v. Miami-Dade Cnty. Sch. Bd., 757 F.3d 1173, 1181 (11th Cir. 2014). Issues of law are reviewed de novo. Walker Cnty. Sch. Dist. v. Bennett, 203 F.3d. 1293, 1295 n.6 (11th Cir. 2000); see generally Draper v. Atlanta Indep. Sch. System, 518 F.3d 1275, 1284 (11th Cir. 2008).

**SUBSTANTIAL ERRORS IN THE DECISION OF THE ADMINISTRATIVE LAW JUDGE BECAUSE THE PALM BEACH COUNTY SCHOOL BOARD DID NOT PROVIDE FAPE**

The ALJ committed reversible errors on numerous bases set forth below. The ALJ's Final Order does not accurately reflect the testimony and evidence presented

In *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982), the Supreme Court held that in order to ensure FAPE for a child with a disability, a school district must develop an IEP which provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Courts have held that failure to provide an IEP constitutes a denial of FAPE. Blackman v. Dist. of Columbia, 277 F. Supp. 2d 71, 79 (D.D.C. 2003), *citing Walker*, 157 F. Supp. 2d at 32. Other courts have specifically found that the violation of Child Find is a procedural violation that results in the denial of FAPE. *Phyllene W.*, 630 Fed. Appx. at 925.

In Endrew F. v. Douglas County School District, 580 U.S. 386 (2017) is a landmark decision that significantly clarified the standard for determining whether a student with a disability has been provided with a Free Appropriate Public Education (FAPE) under the IDEA. The Supreme Court rejected the previous "de minimis" standard established in *Board of Education v. Rowley* and held that to meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light ofthe child's circumstances. This means that the IEP must be tailored to the individual student's unique needs and designed to help them make meaningful progress.

The court emphasized the importance of collaboration between schools and parents in the IEP process. Schools must utilize their expertise to develop an appropriate educational program, but they must also consider and respond to the input of parents, who are essential partners in the child's education.

This court must first determine whether the school complied with the IDEA's procedural requirements. Rowley, 458 U.S. at 206. This is an inquiry into "the process by which the IEP is produced, rather than [into] the myriad of technical terms that must be included in the written document," Doe v. Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990), or into mere technical violations, which do not provide a basis for invalidating an IEP, Dong v. Bd. of Educ. of Rochester Cmty. Sch., 197 F.3d 793, 800 (6th Cir. 1999). An important aspect in assessing procedural compliance is whether there was adequate parental involvement and participation in formulating an IEP. See Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor, 185 F.3d 635, 642 (6th Cir. 1999); see also Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 858 (6th Cir. 2004) ("Participation must be more than a mere form; it must be meaningful.").

The court must first determine whether the school complied with the IDEA's procedural requirements, particularly regarding parental involvement and participation in formulating the IEP. The participation must be meaningful, not just a formality. If procedural requirements are met, the court then assesses the IEP's substantive educational plan, determining whether it was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

Plaintiff bears the burden of proof with respect to each of the claims raised in the Complaint. Schaffer v. Weast, 546 U.S. 49, 62 (2005). At all times relevant to the Amended

Complaint, Plaintiff was a student with a disability as defined under 34 C.F.R. § 300.8(a)(1); 20 U.S.C. § 1401(3)(A)(i); and rule 6A-6.03411(1)(f).

Palm Beach County School Board is a local education authority ("LEA") as defined under 20 U.S.C. § 1401(19)(A). By virtue of receipt of federal funding, the Plaintiff is required to comply with certain provisions of the IDEA, 20 U.S.C. § 1401, et seq. As an LEA, the Plaintiff is required to make FAPE available to the student under the IDEA. Sch. Bd. of Lee Cnty. v. E.S., 561 F. Supp. 2d 1282, 1291 (M.D. Fla. 2008) (citing M.M. v. Sch. Bd. of Miami-Dade Cnty., 437 F.3d 1085, 1095 (11th Cir. 2006)); M.H. v. Nassau Cnty. Sch. Bd., 918 So. 2d 316, 318 (Fla. 1st DCA 2005).

In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); Phillip C. v. Jefferson Cnty. Bd. of Educ., 701 F.3d 691, 694 (11th. Cir. 2012). The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system. 20 U.S.C. § 1400(c)(2)(A)-(B). To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements. Doe v. Ala. State Dep't of Educ., 915 F.2d 651, 654 (11th Cir. 1990) see also Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988 (2017).

Local school systems must also satisfy the IDEA's substantive requirements by providing all eligible students with FAPE, which is defined as: Special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without

charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under 20 U.S.C. § 1414(d)]. 20 U.S.C. § 1401(9).

Parents and children with disabilities are accorded substantial procedural safeguards to ensure that the purposes of the IDEA are fully realized. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 205-06 (1982). Among other protections, parents are entitled to examine their child's records and participate in meetings concerning their child's education; receive written notice prior to any proposed change in the educational placement of their child; and file an administrative due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1), (b)(3), (b)(6).

The IEP is the centerpiece of the statute's education delivery system for disabled children." Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (quoting Honig v. Doe, 108 S. Ct. 592 (1988)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 181 (1982)).

20 U.S.C. § 1412(a)(5)(A) and 34 C.F.R. § 300.114, mandate that, to the maximum extent appropriate, children with disabilities, including those in public or private institutions or other care facilities, are required to be educated with children who are not disabled. Only under exceptional circumstances where education in general education classes cannot be achieved satisfactorily, even with the use of supplementary aids and services, should other alternatives such as special classes or separate schooling be considered.

To satisfy the IDEA's substantive requirements, school districts must provide all eligible students with FAPE, which is defined as: [S]pecial education services that have been provided at public expense, under public supervision and direction, and without charge; meet the standards of the State educational agency; include an appropriate preschool, elementary school, or secondary school education in the State involved; and are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

In addition to requiring that school districts provide students with FAPE, the IDEA further gives directives on student placements or educational environment in the school system. Specifically, 20 U.S.C. § 1412(a)(5)(A) provides, as follows: Least restrictive environment. (A) In general. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

With the LRE directive, Congress created a statutory preference for educating handicapped children with children who are not handicapped to the maximum extent appropriate. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 181 n.4 (1982). "By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the Act, school districts must both seek to mainstream handicapped children and, at the same time, must tailor each child's educational placement and program to his special needs." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1044 (5th Cir. 1989).

Courts have long held that mainstreaming is the starting point and presumption. Bd. of Educ. v. Holland, 786 F. Supp. 874, 882 (E.D. Cal. 1992) ("A placement in other than a regular class is a fall-back choice made only after it is determined that placement in regular classes will be unsuccessful."). Removal from the general education setting can occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 448 (9th Cir. 2010); Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H., Id., Oberti v. Board of Educ., 995 F.2d 1204, 1214 (3d Cir. 1993); Daniel, 874 F.2d at 1044-

Rules implementing the IDEA define supplementary aids and services as "aids, services and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate." 34 C.F.R. § 300.42.

In Daniel, the Fifth Circuit set forth a two-part test for determining compliance with the mainstreaming requirement: First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. See § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate. Id. at 1048. 140. The Daniel court provided the following general guidance: The [IDEA] and its regulations do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some

academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess. The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops. If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the [IDEA]. Daniel, 874 F.2d at 1050 (internal citations omitted).

With the LRE directive, "Congress created a statutory preference for educating handicapped children with nonhandicapped children." Greer v. Rome City Sch. Dist., 950 F.2d 688, 695 (11th Cir. 1991). "By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the Act, school districts must both seek to mainstream handicapped children and, at the same time, must tailor each child's educational placement and program to his special needs." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1044 (5th Cir. 1989).

In Greer, the Eleventh Circuit adopted the Daniel two-part inquiry. In determining the first step, whether a school district can satisfactorily educate a student in the regular classroom, several factors are to be considered: (1) a comparison of the educational benefits the student would receive in a regular classroom, supplemented by aids and services, with the benefits he will receive in a self-contained special education environment; (2) what effect the presence of the student in a regular classroom would have on the education of other students in that classroom; and (3) the cost of the supplemental aids and services that will be necessary to achieve a satisfactory education for the student in a regular classroom. Greer, 950 F.2d at 697.

20 U.S.C. § 1414(a)(2) governs reevaluations and requires a local educational agency be reevaluated at least once every 3 years, unless the parent and the local educational agency agree

that a reevaluation is unnecessary. The local educational agency shall provide notice to the parents of a child with a disability, in accordance with subsections (b)(3), (b)(4), and (c) of section 1415 of this title, that describes any evaluation procedures such agency proposes to conduct. The waiver needs to be in writing. See also 34 C.F.R. § 300.303.

In L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ., No. 15-1019 (2d Cir. 2016), the U.S. Court of Appeals for the Second Circuit ruled that a persistent pattern of procedural errors and carelessness over consecutive years—including failures in proper evaluation and IEP execution—cumulatively deprived the student of a FAPE. [1]. In D.S. By & Through M.S. v. Trumbull Bd. of Educ., 975 F.3d 152 (2d Cir. 2020), the Second Circuit affirmed that the statutory provision strictly mandates school districts to conduct a triennial reevaluation at least every three years. However, a district may forgo testing only if the parent and the IEP/PPT team mutually agree in writing that a reevaluation is unnecessary.

The procedural violation was substantial because it impeded the child's right to a FAPE and significantly impeded the parents' opportunity to participate in the decision-making process. It caused a deprivation of educational benefits (i.e., operating on "stale data" that left the IEP out of step with the student's actual needs)

N.C's placement in Access Point was a violation of the LRE provision of the IDEA. The record is clear that Defendants failed to reevaluate N.C. for a period exceeding ten years, between 2010 and 2022. During that time, the Board placed N.C. on an Access Points curriculum dispute it being a more restrictive environment than a general education track. There existed no evidence or data that suggested Access Points was an appropriate placement for N.C., but The District maintained his placement there for an exceedingly long period of time, without justification. Instead, it is made clear by N.C.'s current progress in a general education curriculum that he

would have been successful in said track had he been mainstreamed at an earlier age, thus depriving him of FAPE, and placing The District in violation of the LRE provision of the IDEA.

DOAH erred because the Board failed to provide FAPE by placing and keeping N.C. on the ACCESS Curriculum despite his average intellectual abilities, thereby not providing an educational program reasonably calculated to enable him to make progress appropriate in light of his circumstances, as required by the Supreme Court in Endrew F. v. Douglas County School District, 137 S. Ct. 988 (2017); by failing to timely and appropriately reevaluate N.C. for a period of approximately twelve (12) years, despite data showing need and parental reliance of the School Board's representations. 20 U.S.C. § 1414 and 34 C.F.R. 300.303; by not addressing N.C.'s behavioral, social/emotional, and independent functioning needs, which are essential components of his education under 20 U.S.C § 1414(d)(3) and by failing to ensure education in the least restrictive environment by placing and keeping N.C. on a curriculum designed for students with intellectual disabilities and withholding access or recommendation to Plaintiff to general education classes and curriculum for years, without adequate, current evaluative justification.

The School Board's actions violated multiple provisions of the IDEA, including but not limited to:20 U.S.C. § 1412(a)(1) – Assurance of FAPE; 20 U.S.C. § 1414 – Evaluations, eligibility determinations, IEPs, and educational placements and 20 U.S.C. § 1415 – Procedural safeguards. N.C. has been denied the opportunity to make meaningful educational progress appropriate in light of his circumstances.

**N.C. IS ENTITLED TO COMPENSATORY EDUCATION**

Section 1415(i)(2)(C)(iii) of 20 U.S.C. provides that the district court "shall grant such relief as the court determines is appropriate." This has long been seen as giving a district court broad discretion to award relief. *Town of Burlington*, 471 U.S. at 369 (permitting parents of a

child denied FAPE to recover tuition reimbursement for placement in a private school). Shortly afterwards, it was held that this broad grant of authority was available to provide compensatory educational services for the denial of FAPE. Miener v. State, 800 F.2d 749 (8th Cir. 1986*);* The authority of hearing officers to award compensatory education has long been held to be co-extensive with that of reviewing courts. Cocores v. Portsmouth, N.H., Sch. Dist. 779 F. Supp. 203 (D.N.H. 1991); Compensatory education "involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." In Reid v. Dist. of Columbia, 401 F.3d. 516 (D.C. Cir. 2005). *Reid* held that an award of compensatory education "should aim to place disabled children in the same position they would have occupied but for the school district's violation of the IDEA." *Id.* at 523. The inquiry as to the award must be fact specific and "must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id*. Further, "whereas ordinary IEPs need only provide 'some benefit,' compensatory awards must do more - they must compensate." *Id*. at 525. This is the standard in the Eleventh Circuit. Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1289 (11th Cir. 2009).

Compensatory education awards crafted by a court or a hearing officer are "fact- specific" and must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place" *Reid,* 401 F.3d at 523-24; *Branham v. Dist. of Columbia*, 427 F.3d 7, 13 (D.C. Cir. 2005). Here, an order requiring the School District to fund the private procurement of educational services for N.C.. to educationally compensate him. Also, issue e a declaratory judgement that the School Board's substantive educational and due process practices, policies, and procedures, and

conditions are violative of Plaintiff's rights as secured by the IDEA and enter an Order requiring the Defendants to provide Plaintiff's the relief sought by Plaintiff, on behalf of N.C., at the impartial due process hearing.

In addition, enter an Ordering requiring the Defendants to make the Plaintiffs whole by awarding N.C. compensatory education and/or the educational services he would have received in the absence of the Defendants' unlawful conduct and requiring the Defendants to make the Plaintiffs whole by awarding N.C. compensatory damages for the Defendants' unlawful conduct. Finally, award Ms. Cerra reasonable attorney fees and costs in reimbursement for all time spent pursuing the instant litigation and such relief as the Court deems appropriate and just.

**CONCLUSION**

For the reasons set forth above, this Court should grant Plaintiff's motion and any other relief that is just and equitable.

Dated: November 2, 2026

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP, P.C.

Stewart Lee Karlin Esq.
2003 W. Cypress Creek Road, Suite 100
Fort Lauderdale, FL 33309
(212) 792-9670
slk@stewartkarlin.com
Florida Bar No. 0961159

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 2nd day of November 2026 a true and correct copy of the foregoing was electronically filed with the U.S. District Court, Southern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

STEWART LEE KARLIN, ESQ